845 F.2d 1254
 92 A.L.R.Fed. 621, 18 Collier Bankr.Cas.2d 1214,
Bankr. L. Rep. P 72,308
 In re Billy H. HARBOUR, Debtor.
Donald W. HUFFMAN, Trustee, Plaintiff-Appellant,
v.
COMMERCE SECURITY CORPORATION; Vivian S. Brandon,
Defendants-Appellees,
v.
James M. BRANDON; Mary Eddy, Third Party Defendants.
In re Billy H. HARBOUR, Debtor.
Donald W. HUFFMAN, Trustee, Plaintiff-Appellee,
v.
COMMERCE SECURITY CORPORATION; Vivian S. Brandon,
Defendants-Appellants,
v.
James M. BRANDON; Mary Eddy, Third Party Defendants.
 Nos. 87-3610, 87-3611.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 7, 1988.
Decided May 6, 1988.
 
 Carr L. Kinder, Jr. (Bird, Kinder & Huffman, Roanoke, Va., on brief), for plaintiff-appellant.
 John E. Falcone (W. Alan Smith, Jr., Smith, Angel & Falcone, P.C., Lynchburg, Va., on brief), for defendants-appellees.
 Before RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 Billy H. Harbour (Harbour), the debtor, and James Brandon were business associates and friends prior to certain of Harbour's creditors filing an involuntary petition for bankruptcy against Harbour on February 11, 1982. The bankruptcy began in Chapter 11 but was ultimately converted to a Chapter 7 proceeding on September 13, 1983.
 
 
 2
 This appeal involves an action by the trustee in bankruptcy, Donald W. Huffman, to recover certain funds transferred by Harbour to Vivian Brandon or Commerce Security Corporation (CSC), the defendants, prior to Harbour's declaration of bankruptcy. Vivian Brandon controls CSC, a real estate holding company. Vivian Brandon is also James Brandon's mother.
 
 
 3
 Counts I-IV of the bankruptcy trustee's amended complaint involve $179,450.00 which Harbour moved in a series of transactions to Vivian Brandon or CSC, and then to James Brandon. Vivian Brandon never held these funds for longer than a day but was simply an intermediary for passage of this money from Harbour to her son. Harbour never received any consideration from Vivian Brandon or CSC in exchange for these transfers, and these defendants offered no legitimate business reason for Harbour's transferring funds to James Brandon by first going through his mother.
 
 
 4
 Vivian Brandon was a teacher at a business secretarial school for over twenty three years. She testified that she had been acquainted with Harbour for approximately nineteen years and had seen him "almost daily" during significant portions of that time. Vivian Brandon also testified that she had "no idea" why Harbour chose to transfer money to James Brandon through her, nor did she ever ask. She claimed that she agreed to process the funds because Harbour asked her to do so, and that she trusted Harbour because he was like a member of her family. There is no dispute that Vivian Brandon received no portion of the funds transferred. The bankruptcy court granted judgment in favor of Vivian Brandon and CSC with regard to the $179,450.00 involved in Counts I-IV of the amended complaint and refused to allow the trustee to recover these funds.
 
 
 5
 Count VI of the trustee's amended complaint involves another series of payments by Harbour to Vivian Brandon. She did not send these payments on to her son but kept them. They totaled $11,250.00. The bankruptcy court found that Harbour received no consideration from Vivian Brandon for any of these payments other than one for $1,000.00, and so entered judgment in favor of the trustee for $10,250.00 on Count VI.
 
 
 6
 Finally, Count VII of the amended complaint involves a wire transfer of $38,340.00 from CSC to James Brandon. Although Vivian Brandon admitted that this transaction "would have to have been" a transfer of Harbour's money to her son, the bankruptcy court found that the trustee failed to produce sufficient evidence that Harbour did not receive adequate consideration from CSC for the money. The bankruptcy court therefore granted judgment in favor of the defendants on Count VII and refused to allow the trustee to recover these funds. The district court, which found that Vivian Brandon was an "innocent dupe" of her son and Billy Harbour, affirmed the bankruptcy court's judgment with respect to each count of the amended complaint listed above.
 
 Analysis
 
 7
 The most important question in this case involves the trustee's attempt to recover the $179,450.00 put in issue by Counts I-IV of the amended complaint. Section 544(b) of the Bankruptcy Code, the so-called "strong arm" clause, grants to the trustee in bankruptcy the same right to avoid transfers as an unsecured creditor under applicable state law. 11 U.S.C. Sec. 544(b) (1982). The applicable state law in this case is Va. Code Ann. Sec. 55-81 (1986), which provides:
 
 
 8
 Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, ... shall be void as to creditors whose debts shall have been contracted at the time it was made....
 
 
 9
 Since the defendants, Vivian Brandon and CSC, concede that Harbour received no consideration for his transfers of $179,450.00 to them, there is no question that these transfers are voidable by the trustee.
 
 
 10
 Having determined that these transfers are voidable, we next decide: voidable as to which parties? For the answer we look to section 550 of the Bankruptcy Code, since "[s]ection 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 90 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5876, 6331. Section 550 provides, in pertinent part:
 
 
 11
 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title [11 U.S.C.], the trustee may recover for the benefit of the estate, the property transferred, or, if the court properly so orders, the value of such property, from--
 
 
 12
 (1) The initial transferee of such transfer or the entity for whose benefit such transfer was made; ...
 
 
 13
 11 U.S.C. Sec. 550 (1982 & Supp. IV 1986) (emphasis added).
 
 
 14
 The trustee here concedes that the defendants were not the entities for whose benefit Harbour's transfers were made, since the defendants received no portion of the $179,450.00. The defendants simply held each of the transfers for a short period and then sent them on to James Brandon. Instead, the trustee contends that he may recover from the defendants as the "initial transferees" of the funds.
 
 
 15
 There is no dispute that the defendants were in actual fact the initial recipients of the debtor's transfers. If section 550(a)(1) is read literally, therefore, the defendants are liable and no further analysis is necessary. At least one court has held that section 550(a)(1) is to be applied literally. Mixon v. Mid-Continent Systems, Inc. (In Re Big Three Transportation, Inc.), 41 B.R. 16, 20-21 (Bankr.W.D.Ark.1983).
 
 
 16
 A purely literal reading of section 550(a)(1), however, appears to be an interpretation that is too narrow to fit all circumstances. Several lower courts have so held. The seminal case in this regard is Gropper v. Unitrac, S.A. (In Re Fabric Buys of Jericho, Inc.), 33 B.R. 334 (Bankr.S.D.N.Y.1983). Fabric Buys involved a payment by a debtor prior to bankruptcy to one of his creditors in settlement of a lawsuit brought by the creditor for goods sold and delivered. The debtor transferred the funds to the creditor's attorney. The attorney deposited the payment in his client escrow account, and within approximately two weeks forwarded it to the creditor.
 
 
 17
 The trustee, seeking to avoid this payment as preferential, sought to recover it from the creditor's attorney as the "initial transferee" under section 550(a)(1). The court, however, held for the attorney and expressly rejected the trustee's contention that the court should read the phrase "initial transferee" literally. The court described the law firm as a "mere conduit" for the funds, and stated: "That such amount was funneled through the escrow account does not make Unitrac's [the creditor's] lawyer an initial transferee." Id., 33 B.R. at 337.
 
 
 18
 As a separate and distinct ground for its decision in Fabric Buys the court cited its equitable power to prevent an unjust result:
 
 
 19
 In some circumstances, a literal application of section 550(a) would permit the Trustee to recover from a party who is innocent of wrongdoing and deserves protection. In such circumstances the bankruptcy court should exercise its discretion to use its equitable powers under section 105(a) and 28 U.S.C. Sec. 1481 to prevent an inequitable result.[1]
 
 
 20
 Id., quoting 4 Collier on Bankruptcy p 550.02, at 550- (15th ed. 1983).
 
 
 21
 Other courts have followed the lead of Fabric Buys.[2] In Metsch v. First Alabama Bank of Mobile (In Re Colombian Coffee Co., Inc.), 59 B.R. 643 (Bankr.S.D.Fla.1986), aff'd, 75 B.R. 177 (S.D.Fla.1987), the Bankruptcy Court held that a bank which received transfers for deposit in a customer's account was not an "initial transferee" but a mere "commercial conduit" of the funds, and recovery of the deposit by the bankruptcy trustee was not allowed. In Metsch v. City National Bank of Miami (In Re Colombian Coffee Co., Inc.), 64 B.R. 585 (Bankr.S.D.Fla.1986), the pertinent facts were essentially parallel to those in the first Colombian Coffee case cited above, but in this case the debtor controlled and dominated the defendant bank. Nonetheless, the court held that the bank was a mere "commercial conduit" and again refused recovery to the trustee. Id., 64 B.R. at 586. Both of the Colombian Coffee cases also relied on the bankruptcy court's equitable powers as an alternative ground for their decisions.
 
 
 22
 Salomon v. Nedlloyd, Inc. (In Re Black & Geddes, Inc.), 59 B.R. 873 (Bankr.S.D.N.Y.1986), involved the bankruptcy trustee of a freight forwarder trying to recover an amount paid to a steamship agent acting on behalf of a common carrier. The court, holding that a "mere conduit" of funds is not an "initial transferee" under section 550, refused the recovery.
 
 
 23
 We cite with approval these cases which recognize that the initial recipient of a payment may not always be an "initial transferee" for purposes of section 550(a)(1). We note, however, that all of the defendants in these decisions, with one possible exception, were clearly commercial entities.[3] And in the cases where the trustee's recovery was denied there was no hint that the defendants' handling of the debtor's funds in any way departed from their normal handling of commercial transactions. E.q. Fabric Buys; In Re Colombian Coffee cases; Salomon v. Nedlloyd, supra.
 
 
 24
 The defendants here, on the other hand, are not commercial enterprises. Although we do not wish to declare that a "mere conduit" exception to section 550(a)(1) should apply only to commercial entities, we do recognize that the likelihood of bad faith on the defendant's part is lessened where the defendant is a commercial enterprise handling transactions in a routine fashion. In none of the cases above where recovery was denied to the trustee was there a finding by the court of bad faith on the part of the commercial defendant. It is noteworthy that the court in Fabric Buys opined that the question of "good faith" is irrelevant to a consideration of whether a party is an "initial transferee" under section 550(a)(1). 33 B.R. at 336, n. 1. But if a defendant who is the initial recipient of funds asks the court on essentially equitable grounds to declare that the defendant is not an "initial transferee" under section 550(a)(1), then clearly this defendant must not have acted inequitably, i.e., in bad faith.
 
 
 25
 In the instant case, the initial recipient of the transfer, Vivian Brandon, was the ultimate recipient's mother and, based on her own admissions, practically a surrogate mother to the debtor, Harbour. When Vivian Brandon was asked why she thought that the debtor and her son wished to process these transfers through her, she simply stated:
 
 
 26
 [Vivian Brandon]: I have no idea why, simply that they did.
 
 
 27
 THE COURT: And you never asked why?
 
 
 28
 [Vivian Brandon]: No, I never questioned that he didn't have the money to do what he wanted to do with.
 
 
 29
 Another representative portion of the record of Vivian Brandon's testimony includes these lines:
 
 
 30
 QUESTION: It never crossed your mind as to why he wanted you to do these things instead of him doing it himself?
 
 
 31
 [Vivian Brandon]: That's just the way he did things.
 
 
 32
 When the court asked Vivian Brandon why she agreed to handle Harbour's transfers to her son, she stated: "They were like my children, Jim Brandon was my son, Billy was like a household member, and I didn't think they were doing anything wrong." In other words, Vivian Brandon claims to have been entirely ignorant of the reasons behind the financial maneuverings of Harbour and her son. Even more incredible, she alleges that she made no effort to discover the reasons.
 
 
 33
 Vivian Brandon was a teacher at a business/secretarial school for over twenty-three years. There was no evidence presented that she was of less than average intelligence. She was in a close relationship with both of the other two corners of this triangular transaction. There was no evidence of any valid business reason for the debtor Harbour to have structured his transfers to James Brandon in the manner that he did. Yet Vivian Brandon claims she never once asked either of these men why they needed her in order to process these transfers, and she claims that they never explained these curious transactions to her. Examining these facts in the light most favorable to Vivian Brandon, the kindest inference which can reasonably be drawn is that she aggressively ignored facts which would have put her on notice that she should investigate these facially suspect transactions.
 
 Conclusion
 
 34
 We look with approval on that line of lower court decisions which recognizes that the initial recipient of funds from a debtor may not always be an "initial transferee" within the meaning of 11 U.S.C. Sec. 550(a)(1). Since, however, the initial recipient is asking the court to ignore the literal meaning of section 550(a)(1) on essentially equitable grounds, this party must have acted in "good faith" with respect to the relevant transaction in order to be spared the effects of this code provision. We find that Vivian Brandon did not, as a matter of law, act in "good faith" when she served as an intermediary in Harbour's transfer of $179,450.00 to James Brandon. Even assuming that she did not know and did not ask why these funds were being processed through her, such wilful ignorance in the face of facts which cried out for investigation may not support a finding of good faith on her part.
 
 
 35
 We hold that the district court's finding that Vivian Brandon was an "innocent dupe" is "clearly erroneous."[4] She was at best a "willing dupe." We accordingly reverse the district court's judgment in favor of Vivian Brandon with respect to the $179,450.00 put in issue by Counts I-IV of the amended complaint. We remand with instructions to enter judgment in favor of the trustee with respect to these counts. In addition, we affirm the judgment of the district court with respect to Counts VI and VII of the amended complaint.
 
 
 36
 AFFIRMED IN PART REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 The continued effectiveness of 28 U.S.C. Sec. 1481 (1982 & Supp. III 1985) is open to question. See Better Homes of Virginia, Inc. v. Budget Service Co. (In Re Better Homes of Virginia), 52 B.R. 426 (E.D.Va.1985), aff'd, 804 F.2d 289 (4th Cir.1986); 28 U.S.C.S. Sec. 1481 (Explanatory notes) (Supp.1987)
 
 
 [2]
 Bakst v. Schilling (In Re Cove Patio Corp.), 19 B.R. 843 (Bankr.S.D.Fla.1982) (where corporation which initially received funds was a "good faith" transferee not acting wrongfully in concert with the ultimate recipients then trustee's recovery denied); Schmitt v. Equibank (In the matter of R.A. Beck Builder, Inc.), 34 B.R. 888, 894 (Bankr.W.D.Pa.1983) ("[T]he Court does not favor a literal application of Sec. 550(a)(1) to the facts at bar when such an application would lead to an inequitable result.")
 
 
 [3]
 It is unclear based on the reported decision whether the defendant corporation in the Cove Patio case, supra, n. 1, is a true "commercial" enterprise
 
 
 [4]
 A factual finding is " 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In addition, the Supreme Court has stated that if the district court's view of the evidence is "plausible in light of the record viewed in its entirety, the court of appeals may not reverse...." Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We are convinced that the district court's view of Vivian Brandon as an "innocent dupe" is simply not plausible