In re COLOMBIAN COFFEE CO., INC., Debtor.

Bankruptcy No. 83–00904–BKC–TCB.

United States Bankruptcy Court, S.D. Florida.

June 1, 1988.

Weitzner & Russo, P.A., Arthur S. Weitzner, Jr., Miami, Fla., for trustee.

Colombian Coffee Unsecured Creditors Committee, Davis, Polk & Wardwell, New York City, and Law Offices, Podhurst, Or-

seck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Steven C. Marks, Miami, Fla., Ernst & Whinney, New York City, for Carlton, Fields and Ernst & Whinney.

Lawrence R. Metsch, McDermot, Will & Emery, Miami, Fla., Chapter 11 Trustee.

Herbert Stettin, for Hauser & Metsch, P.A., Miami, Fla., (Trustee's law firm), and Special Counsel (Ferber Greilsheimer Chan & Essner), New York City, for Chapter 11 Trustee, and Special Counsel, Paul M. Kade, Miami, Fla., for Chapter 11 Trustee.

John K. Olson, Stearns Weaver Miller, Weissler, Alhadeff & Sitterson, P.A., Tampa, Fla., for Unsecured Creditors Committee.

Thomas Tew, Tew Jorden & Schulte, Miami, Fla., for debtor.

### ORDER ON CHAPTER 11 FEES

THOMAS C. BRITTON, Chief Judge.

This chapter 11 case, filed in May 1983, was converted to chapter 7 in February 1987. At the request of the chapter 7 trustee, a hearing was held April 25, 1988 to fix the chapter 11 fees and expenses.

There are six applications (CP 334) totalling $658,101, of which $41,705 has been paid as interim allowances.[1] The estate totals about $1.5 million. There are over $50 million in claims. After four years of this bankruptcy administration, therefore, creditors will recover less than two cents on the dollar.

Fee applications are governed by the criteria specified in 11 U.S.C. §§ 326 and 330 and the requirements of B.R. 2016 in light of the principles stated in *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); and *Norman v. Hous-*

*ing Authority of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988).

### History of the Case

Though there was considerable activity in other related cases, nothing of significance happened in this case during the first two and a half years, while the debtor's principal, Duque, was being prosecuted and ultimately convicted in the district court of massive fraud.

In December 1985, a chapter 11 trustee was appointed at the instance of the creditors' committee.

A total of $854,981 was turned over to the chapter 11 trustee by the debtor's counsel. About $450,000 of that sum was received in mid-1985 from the settlement of two actions (85-1131 and 85-1132) in which this estate was represented by special counsel (the attorney who was later appointed the chapter 11 trustee). He has already been compensated for those services and is not now claiming anything for those services.[2] No part of the remaining funds turned over to the chapter 11 trustee was recovered by any of the present fee applicants.

In February 1987, 14 months after he was appointed, the chapter 11 trustee moved for the conversion of the case to chapter 7. The chapter 7 trustee has retained different counsel and is now ready to wind up this case.

The estate presently consists of about $1.5 million, but only $122,300 and interest on the rest was contributed during the 14-month tenure of the chapter 11 trustee. All of that sum was recovered by that trustee and his law firm. None of the remaining applicants has recovered anything for this estate. The collective fee applications are more than five times the contribution to this estate.

### The Chapter 11 Trustee and His Firm

During the nine months following his appointment in December 1985, the chapter

---

1. All other fees have been paid. The debtor's attorneys handled this and three other related, but unconsolidated bankruptcies. With all other professionals involved in this case, they received their final compensation for all four cases in November 1984. (CP 1008 in 83-00889).

2. He received $36,024. (CP 1319 in 83-00889).

11 trustee filed nine actions in this court seeking recovery of allegedly fraudulent or preferential transfers.[3]

He recovered a total of $122,300 in two settlements (86–0122 and 86–0610). He voluntarily dismissed one action (86–0339) and lost the others after trial. He has appealed most of them to the district court without success.

He was represented by his own firm and by two special counsel recruited by him. The three law firms seek a total of $179,024 for this effort, almost half again as much as they recovered. I find that most of this effort was misdirected.

The trustee convinced himself that § 550(a)(2) permitted this estate to recover large transfers from banks and other commercial intermediaries through whom large funds had passed on their way to related debtor entities dominated by the same principal. Section 550, which was enacted in 1978 as a new provision, has been examined in only a few published bankruptcy court decisions, one of which appeared to offer some support to the trustee's theory.

■ The trustee's first case was dismissed by this court 51 days after it was filed. *Metsch v. First Alabama Bank of Mobile (In re Colombian Coffee Co., Inc.)*, 59 B.R. 643 (Bankr.S.D.Fla.1986). As that opinion reflects, it is clear to me that the trustee's theory was unsound, but it was not so completely untenable as to evince bad faith on his part. I do not, therefore, fault this able and diligent attorney, who had the support of the creditors' committee, for presenting his theory.

However, when he elected to appeal that decision and also chose to file eight other actions (seven in the next 60 days) and appeal most of those, he and his co-counsel did so at their own risk. They owed this estate better judgment. The creditors should not bear the expense of their contin-

ued and expensive, but completely unsuccessful efforts to vindicate a rejected legal theory.[4]

The statute of limitations, which allowed him two years from his appointment to file these actions, was not a factor. § 546(a)(1).

The trustee's law firm seeks $111,123 in fees and $11,750 as expenses. Neither he nor I has totalled the time charges in the three voluminous billing statements attached to the fee applications. (CP 224, 147 and 87 in 83–00904). In addition the trustee requests compensation in an unspecified amount for his lay services as trustee. (CP 222).

I find that the *reasonable* time spent by the trustee's firm in the litigation it initiated and conducted (a part of which did not involve the trustee's dubious theory) could not have exceeded 200 hours and that the reasonable *average* hourly cost of that work by that firm was $150 or a total of $30,000. The bulk of the work was done by the trustee and an associate, who billed at $175 and $135, respectively. The average hourly cost of comparable bankruptcy services by bankruptcy firms at that time in this court was below $150.

In addition to the foregoing, the trustee as such is entitled to $2,500 for his 14–month stewardship in the care of the funds entrusted to him by debtor's counsel and his other lay services. In this case, the trustee has had no responsibility for personal property, no sales to conduct, no distribution to be made, and virtually no inquires from creditors other than those from counsel for the creditors' committee members.

I find he is also entitled to reimbursement for his reasonable expenses in the amount of $5,409.60. The ordinary expenses of operating a law office such as in-house machine copying, postage, a mes-

---

3. One action (86–0311) sought and obtained an order requiring the debtor's principal, who was in prison and had invoked the Fifth Amendment, to consent to disclosure by banks of his accounts in Panama and Colombia. He accomplished nothing by this action.

4. The trustee and the attorneys he had employed were bluntly and explicitly warned by this court's Order on Motions for Interim Compensation of September 23, 1986 that they were proceeding at their own risk. (CP 161). That warning was clearly implicit in this court's decision of the first case.

senger, and parking have been considered in evaluating hourly charges and have not been allowed as additional expenses. 6A *Collier on Bankruptcy* (14th Ed.1977 Rev.) ¶ 13.02, n. 77.

These three sums total $37,909.60 toward which the trustee has already been paid an interim allowance of $33,000. The chapter 11 trustee and his firm shall be paid an additional 4,909.60 as final compensation.

### Trustee's Miami Co-Counsel

■ Paul M. Kade was employed in March 1986 to evaluate and, if justified, prosecute a fraud action against Republic National Bank, because the trustee and his firm were disqualified on defendant's motion. The trustee had been with the firm representing the bank during its defense of a similar action by another trustee in a related bankruptcy.

The case was filed May 7, tried June 7 and lost June 17. *Metsch v. Republic National Bank of Miami (In re Colombian Coffee Co., Inc.),* 66 B.R. 211 (Bankr.S.D. Fla.1986). As the opinion reflects, two of the trustee's three counts were based on the same theory rejected in the *Mobile* case before Kade was employed. The remaining count had been litigated by the estate and lost a year earlier. It lacked merit for other reasons as well.

Kade appealed this court's decision to the district court. The decision was affirmed.

He asks $21,780 for 132 hours spent at $165 an hour. (CP 221). He concedes that his time then was customarily billed at $125 an hour, but he "would have charged $165 for a similar bankruptcy matter due to the novelty and difficulty of the questions involved". That sum exceeds the prevailing average fee currently charged in this district by firms which are experienced in bankruptcy, which this attorney is not.

I find that the reasonable time necessary for this attorney to familiarize himself and analyze the estate's possible claim in this matter should not have exceeded 25 hours and that the reasonable value of his time for those services, to some extent a learning experience, was $125. I am convinced that a more experienced attorney would have abandoned the claim in half the time. The balance of his time, as has been explained above, was his gamble which failed.

This applicant is entitled to $3,125.

### Trustee's New York Co-Counsel

Ferber, Greilsheimer, Chan & Essner was approved on February 5, 1986 as trustee's co-counsel in New York:

"for the purposes of conducting Bankruptcy Rule 2004 examinations and discovery in New York and instituting attachment actions on behalf of the Trustee against the assets of certain Colombian Banks, which assets are being held by correspondent banks in New York." (CP 93a).

The firm requests $31,920 in fees for 236.6 hours spent by attorneys at an average hourly rate of $134.91 plus $2,451 expenses.

Within the scope of its authorized employment, the firm subpoenaed "thousands of pages of documents" from nine New York banks which it sent to the trustee and deposed two friendly witnesses to authenticate documents needed for trial of two matters in Miami.

Without this court's approval (but at the trustee's request), this firm:

"During the period from July 1, 1986 through January 27, 1987, Applicant, at the request of the Chapter 11 Trustee, expended time conducting comprehensive legal research on issues relating to New York and federal law concerning quasi-in-rem and personal jurisdiction, attachments and other provisional remedies and preparing an extensive legal memorandum. This research was performed in contemplation of initiating appropriate proceedings on behalf of the Chapter 11 Trustee in New York against the assets, located in New York, held by the recipients of substantial pre-petition transfers from the Debtor in the year immediately proceeding the filing of CCC's Chapter 11 petition." Final Application (CP 223).

■ None of the firm's efforts resulted in any action or led to the recovery of anything for the estate.

The foregoing unauthorized services were continued for four months *after* this firm's second interim fee application was denied on two grounds—because the trustee's theory, upon which this effort was based, had been rejected by this court four months earlier and because this work was unauthorized. Order on Motions for Interim Compensation (CP 161) and Order on Rehearing (CP 166).

I find that the value of the authorized services performed by the New York firm did not exceed the $6,900 this firm has already received as an interim allowance. At its average billing rate for the trustee, this sum covered 51 hours of attorney time, which should have been more than ample to subpoena the documents, send them to Miami, and take the two friendly depositions.

Had the trustee requested enlargement of the scope of this firm's employment, it would have been denied. For the rest of its effort, therefore, this law firm relied upon the trustee and must look to him, not this court, for compensation.

This firm has received interim allowances of $1,804.84 for all of its reasonable expenses incident to its authorized services. (CP 166). Its present application or reapplication for an additional $646.64 is denied.

### The Accountant and Attorney for the Creditors' Committee

The unsecured creditors' committee consists of undersecured banks which account for almost all, but not all of the unsecured debt. Neither the accounting firm, Ernst & Whinney, nor the law firm, Carlton, Fields of Tampa, would accept employment without a guarantee of payment by the committee.

Some, but not all, of the banks on the committee gave their guarantee and have paid a total of $331,063 to the accountants and $148,012 in fees and expenses to the attorneys. The guarantor members of the committee seek reimbursement of the $479,075 they spent. (CP 339 and Claims 44 and 45).

Readily acknowledging the gross disparity between the committee's expense and the results achieved, the guarantors point out that because they constitute most of the creditors, almost all the estate belongs to them anyway, the disposition of this motion does not make much practical difference.

However, to the extent that it does make a difference, the non-participating creditors, one of whom opposed the second interim fee applications of the trustee and his three law firms, are entitled to this court's careful scrutiny of the fees paid by the committee members.

■ I find the documented application supporting the committee's payment of Ernst & Whinney ($331,063) to have been reasonable. (Claim 44). The disarray of the debtor's records, the invocation of the Fifth Amendment by the debtor's principal, the virtual complete disappearance of some $50 million loaned to this and the related debtors, together with other clear indications of a massive fraud, justified an accounting examination which, necessarily, was both difficult and expensive. The fact that it was almost completely unproductive could not have been foreseen.

The application supporting the committee's payment of Carlton, Fields, the Tampa law firm selected by the committee, presents problems. It consists of several voluminous billings to the guarantor members of the committee, with no total of either the time spent nor any indication of the billing for that time. The statement for expense reimbursement is partially obliterated.

Making a number of assumptions, I gather that the firm began providing services on July 20, 1983 (two months after the bankruptcy) and furnished its last charged service eight months later on March 29, 1984. It was not, however, authorized to represent the committee until September 12, 1983 (CP 253 in 83–00889) four months after it started.

Most, but by no means all, of the services were performed by John Olson, an exceptionally well-qualified attorney for this excellent firm.

Apart from an interim fee application, which was denied March 8, 1984 (CP 642 in 83–00889), and a motion which led to the appointment of the trustee in December 1985, this firm's services were invisible to this court. It sought no relief. It opposed nothing. It recovered nothing for the estate. It exhibited no concern at the debtor's complete inactivity.

The firm billed and was paid a total of $148,012 by the contributing committee members, of which $24,222 was expense reimbursement. The balance of $123,790 would represent 825 hours at an average hourly rate of $150. I do not know what the actual rate was.

The attorney's role was to assist in the accountant's investigation in the hope of locating recoverable assets, to monitor the case, and to advise the committee. Though I do not doubt the time was spent, I cannot reconcile the average expenditure of over 100 hours a month for these eight months.

I find, therefore, that the reasonable value of the services of counsel for the committee did not exceed $60,000.[5] In addition, I find that $11,666 of the requested expenses is reasonable.

I agree with movant that the foregoing sums should be reimbursed to the committee members who paid the accountants and the attorneys for the committee, in proportion to their contribution.

---

5. The committee members who paid for these services were undersecured creditors, who possibly received assistance in their efforts to recover their collateral or wished to assist the criminal prosecution of the debtor's principal. Such activities, though understandable, would not, as I see it, be a predicate for a charge against the estate by the committee for *unsecured* creditors.